# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1888.

### No. 2450.

### J. T. BAKER v. THE STATE.

| 25 | 1 |
| 39 | 384 |

1. ARSON—INDICTMENT.—In the first count of an indictment for arson, the appellant was charged with burning his own house which was "then and there insured." In the second count it was charged that he burned his own house, endangering thereby the safety of houses belonging to other persons. The *locus in quo* is described in both counts as "a certain house then and there occupied, owned and controlled by him the said Baker." *Held*, that this allegation is sufficient, inasmuch as the words "then and there" have definite reference to the date and the county previously alleged in the counts. It was not necessary that the first count should allege the amount of the insurance nor the company in which the house was insured. Nor was it necessary that the second count should allege who were the owners of the houses alleged to have been endangered by the burning of the defendant's house, provided they were not the property of the defendant himself.

2. SAME—PRACTICE—CHARGE OF THE COURT.—It is only when distinct felonies, not of the same character, are charged in different counts of the same indictment, that the State may be required to elect upon which count it will claim a conviction. The indictment in this case charged in the first count that the accused burned his own house, the same being insured; and in the second count that he burned a house and thereby endangered the burning of other houses not belonging to him. The two said counts charge the same felony, and there was no occasion for the election by the State of one count to the exclusion of the other upon which to urge a conviction. But the charge of the court to the jury recites that the State voluntarily abandoned and dismissed the second count; notwithstanding which recital it proceeds to instruct the jury upon the law applicable to the second count. *Held*, error; but not such error as would necessitate reversal in the absence of exception, unless it was calculated to injure the rights of the accused.

3. SAME—CONFESSIONS—"CAUTION."—Admonishment of the accused by the magistrate at the time of the former's examining trial that he was

at liberty to make a voluntary statement, but that the same could be used against him on his trial, is not such a caution as will apply to confessions made at other times and places and to other persons while the accused was in arrest. And while it is not essential that the caution shall immediately precede the confession, in order to qualify it as evidence for the State, the confession, to be admissible, must follow the caution within a reasonable time. See the opinion *in extenso*, and the statement of the case for declarations of the accused which, partaking of the nature of a confession, were made in arrest without due caution, and were, therefore, erroneously admitted in evidence.

APPEAL from the District Court of Grayson. Tried below before the Hon. H. O. Head.

The conviction in this case was for arson, and the penalty assessed against the appellant was a term of five years in the penitentiary.

S. F. Darwin was the first witness for the State. He testified that he resided at the town of Pilot Point, and was an insurance agent by occupation. He was acquainted with the defendant, and was familiar with the property which the defendant owned in the village of Tioga, Grayson county, Texas. On the twenty-seventh day of December, 1884, the defendant insured that property in the Hartford Fire Insurance Company, through the witness, as the agent of said company. He insured his store for three hundred dollars, his stock of drugs for four hundred dollars, his dwelling for three hundred dollars, his furniture for two hundred dollars, and his wearing apparel and office for one hundred dollars. The witness was at Pilot Point when the policies were taken out. He was at Louisville when the fire occurred. He returned home early in April, 1885, a few days after the fire occurred, and remained until April 16, when he went to New Orleans. He canceled the policies on defendant's property after the fire. Defendant made no demand for indemnity upon his policies. The witness was often at Tioga, and as often saw the defendant's property before it was burned, and solicited insurance of the defendant. He was in the defendant's house after the policies were taken out, and was satisfied with the risk. The policies issued by the witness did not contain clauses limiting the liability of the company to three-fourths of the loss to be occasioned by fire. The practice of the Hartford Fire Insurance Company was to exact proof of losses, and to pay the exact loss proved, if it did not exceed the amount stipulated in the policy.

The company did not adjust losses upon the mere estimate of the party assured. The present system of the Hartford Fire Insurance Company was to pay but three-fourths of the losses incurred by fire, but, at the time of the burning of the defendant's property, its system was to pay the entire loss proved within the amount of the insurance. When the defendant took out his policies the witness suggested to him to keep them in bank, and after the fire the witness found them in the Pilot Point bank.

A. J. Mershon was the next witness for the State. He testified that for six years preceding this trial he had lived near the town of Tioga. He owned a store house in Tioga, which stood north of the defendant's property. It was empty on the night of the fire. The course of the railroad at Tioga was north and south. The defendant's lot was about one hundred feet east of the railroad, and was on the northwest corner of the block. It was fenced with palings on the front and for a short distance on each side. The remaining parts of the side fence and the rear fence were made of plank and wire. The defendant's store was a box house about sixteen by twenty feet, and fronted on the sidewalk at the west end of the lot. It had stood on its site, when burned, about three years, and was worth about one hundred and twenty-five dollars. The doors of the store house and the shelving and counters in the same were second hand. The defendant's dwelling stood about thirteen feet east of his store. It consisted of an old building, with a five foot hall on the west, and two rooms on the east. It was an old building which had been removed to that point and then repaired. The roof was covered with old shingles. A shed, constructed in part of new and in part of old lumber, was divided into two rooms, and extended throughout the entire length of the main building. In width it overspanned the main building a few feet on the east. The witness thought that the defendant's residence house, as above described, was worth about two hundred dollars. On the northeast corner of the defendant's lot there was a twelve by fourteen feet room, commonly called "the office," which had been used as a printing office. Joe Smith lived in that office at the time of the fire. The witness had a relative who wanted to buy the defendant's property, and a short time before the fire, and while defendant was having some painting done on his property, the witness opened negotiations with defendant, on behalf of his relative, to purchase the property. This occurred in November, 1884. Defendant offered to sell his property to wit-

ness's relative for five hundred dollars, and urged the trade, but the witness's relative finally declined.

The witness did not reach the defendant's premises, at the time of the fire, until the fire was out. The fire caught at the outside, on the northeast corner of the "L" of the dwelling house. A piece of boxing had been pried off under the window in the west end of the shed room, and there had been a little fire at that place. That window occupied a space which had once been a door. A plank walk, elevated about twelve inches from the ground, extended from the store towards, but not quite to, the window in the shed room. The witness saw coal oil on the floor of the shed room, and a coal oil can in the east shed room near the door. He saw two or three matches near the lamp in the west shed room. Witness also saw the evidence of an incipient fire in the corner of the "L." That fire appeared to have ignited straw, pieces of boxing and such like combustible materials, and to have charred the side of the house and burned some of the shingles. Witness found under the plank walk, at a point near the west window of the shed rooms, a number of pieces of plank, some split wood and some hay. A rain fell after the fire and before morning; and in a puddle of water, between the residence of the defendant and his store, the witness discovered the presence of oil. He saw oil on the floor of the store, on the base of the shelving, and on the east end of the counter. A light wind blew from the southeast on the night of the fire. There was no fire department in Tioga. Had the defendant's dwelling house burned, the witness's store would have burned, and most probably all of the other stores in the village, with one exception. The fire occurred at about eleven o'clock on the night of April 1, 1885. When the witness reached the fire, the citizens had the defendant under surveillance. He was not in actual arrest, but he understood quite well that he was not to leave. Doctor Nichols brought a gun to the fire to be used, if necessary, in maintaining guard over the defendant until the arrival of an officer. Upon the arrival of the officer, before day, defendant was placed in actual arrest and was taken off. A search of the premises was then made, which resulted in the discovery of the traces of coal oil, etc. Witness saw no one go to the defendant's house after the fire and before morning. One man attempted to go to the said house, but witness stopped him. The defendant's drugs, clothing and furniture were not included in the defendant's offer to sell the property for

five hundred dollars. The defendant's lot, independent of the insured property on it, was worth about one hundred dollars. The north door of the shed room described by witness did not fit close at the bottom, and from that point coal oil was scattered along the floor to the crack under the window of the sitting room. The coal oil can which witness found in the shed room, just after the fire, was empty, but had contained coal oil. The house was partly burned. Witness heard the defendant say that he had been chloroformed.

C. T. Bonnie, constable of the Collinsville precinct, in Grayson county, testified, for the State, that he was summoned to Tioga on the night of April 1, 1885, and arrived there just before day on the morning of the second, and arrested the defendant. Just after day light, he got the store key from the defendant and entered his store house. He found coal oil on the floor of the store, the base of the shelving and the east end of the counter. He then entered the dwelling at the north front door. The door on the north side of the east shed room that opened in the "L" corner of the dwelling was open, and witness saw that there had been a fire in the "L" corner of the dwelling. He saw coal oil on the floors of the shed rooms. There was a book case in the west shed room, on which a piece of cloth, the size of an ordinary towel, was nailed. That cloth had been saturated with coal oil. Witness tore that piece of cloth from the book case and took it to Collinsville, to be used as evidence. Witness could not say that any body saw him tear the cloth from the book case, or ever saw him in possession of it. He sent it, and the keys to the defendant's houses, to the defendant's wife, and did not produce them on the preliminary trial of the defendant. That trial was had before Esquire Hudson, at Collinsville, on the day after the fire. Before any witnesses were examined on that trial, the justice of the peace cautioned the defendant that, while he was at liberty to make a voluntary statement, it could be used against him on his final trial. Defendant made no statement on that trial. The witness could not now remember the person by whom he sent the keys and the cloth above mentioned to Mrs. Baker. On the evening after the examining trial, witness placed defendant in the custody of A. T. Pelphrey. Witness found a pistol on the defendant's person when he arrested him.

A. T. Pelphrey testified, for the State, that about night on April 2, 1885, after the examining trial of the defendant, which resulted in the holding of defendant under bond to await the action of the

grand jury, he was placed in charge of the defendant, pending his execution of bond or removal to jail. He did not caution the defendant about making statements to him about his case, nor did he know that anybody else had cautioned him. While at the witness's cow lot, in the custody of the witness, the defendant asked the witness what would be done with him if he should fail to make a bond. Witness told him, in reply, that in that event] he would have to go to jail pending the action of the grand jury. He then told witness that he had a good note for ten dollars, and that he wanted witness to do him a favor. Witness, thinking that he was proposing to sell him the note, replied that he had as much paper as he wanted. The defendant then said that he had a good note for ten dollars and a five dollar gold piece, and that he would give them to witness to do him a favor. The witness, comprehending the drift of the defendant's proposition, replied to him that if he, defendant, escaped from him he would have to do an honest job of it. Defendant replied that he thought witness could do him the favor, as nobody but themselves would ever know anything about it.

J. S. Nichols testified, for the State, that he was a practicing physician and the proprietor of a drug store in Tioga. The defendant was also a practicing physician, and was also the proprietor of a drug store in Tioga. Witness had lived at Tioga about seven years when the defendant came there. When defendant first came there he called upon witness and asked him the condition of the business at that time. Witness told him it was very light to be divided between two doctors and two druggists. A meeting of the business men of Tioga was held at Kile's store early on the evening of the fire. The witness attended that meeting. Kile, Mershon, Adams and Eck Ewing were also present. Neither the defendant nor Dick Ewing were present. That meeting appointed witness and Eck Ewing to guard the town of Tioga on that night. Nearly all of the young people of Tioga left that town early in the evening to attend a dance, a few miles in the country. The moon was in meridian, and was very bright on the night of April 1, 1885. The witness and Eck Ewing left Kile's store at about ten o'clock on that night to assume their duties as town guards. From Kile's store they went north until they passed the defendant's property. They then went northward until they reached Porch's place, about two hundred and fifty yards from defendant's place, and in passing the defendant's place the witness heard somebody walking

about in the defendant's store.  Witness and Eck Ewing remained about Porch's place for about ten minutes, and then returned over the same route they had just traversed.  On the way back the witness saw the defendant standing in his yard at a point just north of the space between the dwelling and the store.  Witness could not now remember whether the defendant was standing in the moonlight or in the shadow of his house. Witness was then dressed in black and wore a stiff derby hat. When witness and Ewing reached Ewing's store, the latter went into his store and the witness went home and got his overcoat. He saw his wife while at home.  Witness then went from his house to a point about seventy-five or eighty yards across the railway track, in a southwest direction from his house.  From that point the witness was chased by some dogs over a course north and along a wagon road west of the railroad, to a point within about one hundred and twenty-five yards of Porch's house.  Witness then passed through Porch's field, and returned to a point in the rear of his own and the defendant's property. As he passed the rear of the defendant's property, he saw the defendant in the "L" corner of his house.  Witness was then within seventy-five feet of defendant.  He then went to Kile's store and changed his stiff hat for Kile's broad brimmed, low crowned soft felt hat.  He made the change partly for comfort and partly for disguise.  The witness then went to his store house, which was west of and near the railroad, and southwest of the defendant's property.  He waited at his store until a north bound freight train, then approaching, got within about eighty yards of him, when he crossed the track, keeping the moving train between himself and defendant's property, and hid behind a pair of scales.  He then changed his position to a lumber pile further north, behind which he hid.  From that point, which was northwest of defendant's house, the witness commanded a good view of defendant's premises.  No person came to the lumber pile or to the scales while the witness was at either of those places.

The witness had been at the lumber pile but a few moments when he heard several pistol shots and the fire signal fired from a point near the defendant's property.  He thereupon ran to a point south of the passing train, and thence towards the defendant's property, until he reached a point within forty feet of it. Witness ran thence to his own house and aroused his family. He then got two buckets of water and passed them over his

fence to parties who had congregated in defendant's yard, and returned to his well for more water. Several parties reached the fire before the witness did. The fire was speedily extinguished, but witness felt assured that, had the fire consumed the defendant's property, it would have spread to and consumed that of his own. Soon after the fire was extinguished, the defendant attempted to enter his house, but was stopped by the witness. He was then kept under surveillance until the officer arrived. No one was permitted to enter the defendant's house until the morning after the fire. This was the fifth time the witness had testified in this case. He had never before testified about being chased by dogs on the night of the fire. He did not, on the first trial of the case, testify about hearing some one walking in the defendant's store shortly before the fire. The defendant was dressed in black, and wore a soft, narrow brimmed black hat on the night of the fire. It was nearly eleven o'clock when the witness changed hats with Kile. Witness had no recollection of going to Ewing's place for his ladder on the evening before the fire; nor did he remember that, a few days after defendant's first trial, he told Mershon that he went to Ewing's on that evening for that ladder; though he may have done so. He remembered hunting for his ladder a few days before the fire. The witness noticed, a week or two before the fire, that the facings of the doors and windows of the defendant's store had been cut and defaced by some person. About the same time he saw a sign hanging on a telegraph pole about eighty feet distant from the defendant's house, but could not now remember what that sign was. The witness occupied the southwest corner of the same block that was occupied by the defendant, and his premises consisted of a drug store in front, residence in the rear of the store, and a barn on the east end of the lot. The witness was postmaster at Tioga, druggist, and a practising physician.

J. Kile testified, for the State, that a meeting of the business men of Tioga was held at his store on the evening of the fire. Adams, Nichols, Ewing, Mershon and witness attended that meeting. The witness and Adams were then partners, and proprietors of a general store. Ewing Brothers were grocery merchants and had a store in Tioga. Nichols was in the drug business. Hatch was a grocery merchant, and occupied the store next to the defendant's store. Mershon had a house in Tioga, but was not in business. Witness was now a brother-in-law of

both Adams and Nichols, but was not so related to Nichols at the time of the fire. At night, about two weeks prior to the fire, the defendant came to witness's house and awakened him. He said that some suspicious characters had been about his store, and that he suspected them to be burglars. He brought some whittlings or shavings with him, which he said he found in front of his store, and asked witness what he thought of them. Witness replied that he thought nothing of them, and then looked about the defendant's premises but discovered no one. Referring to the whittlings or shavings, the defendant said that it looked to him like some one had been trying to start a fire. On the following morning, the witness saw that the awning post and the door and window facings of the defendant's store had been considerably whittled and defaced. Witness once afterwards observed similar whittlings on defendant's store. The witness was familiar with the value of real property in Tioga. Defendant's store was a box house, about sixteen by twenty feet in size, and was worth about one hundred and twenty-five or thirty dollars. His dwelling was worth between two hundred and two hundred and twenty-five dollars. Witness knew nothing about the value of drugs.

The witness reached the fire after others had reached it, but in time to help put it out. While at the south side of the defendant's dwelling, the witness observed a ladder standing against the wall. When Mat Raines started to mount the ladder the defendant caught him and pulled him back saying to him: "Brother Mat, don't go up there or you will be killed." Just after that the defendant said: "Let the dwelling go and save my store." When Raines got away from the ladder, the witness mounted to the roof, and with the water handed up in buckets by the other persons present, and by pulling off burning shingles, he soon extinguished the fire. When the witness reached the defendant's premises the fire was burning the roof of the main building or residence. A watch was placed over the defendant as soon as the fire was got under control. Shortly after that the witness and the defendant got separated from the crowd, and while they were standing near each other the defendant suddenly thrust his hand into his bosom as if to draw a pistol. Witness called to the crowd, and as they came up the defendant withdrew his hand from his bosom. Witness then called to Doctor Nichols to get his gun; which Nichols did. Witness had six times testified in regard to this case, but had never told about the defend-

ant reaching for his pistol until now.  He had never been asked a question about it before.  Soon after the fire was put out, the defendant complained that he was sick, and said that some body had administered chloroform to him and his whole family.  The witness did not see the defendant make any effort to put out the fire.  So far as the witness knew, no person went upon defendant's premises after the fire until the officer arrived. The witness was with the officer, Mr. C. T. Bonnie, when he examined the defendant's premises on the morning after the fire.  He saw an empty oil can near the door in the east shed room.  He saw coal oil on the floor, and on the north wall of both shed rooms.  The witness saw a lamp sitting on the floor in the west shed room, near the west window.  There were a number of matches lying about on the floor near it.  He saw in the east shed room, on the north side, and against the wall, a book case fashioned from a box. That book case had an old cloth curtain to it, and both the curtain and the case were saturated with coal oil.  The witness had never before testified about said curtain.  In the loft of the dwelling there was a large quantity of trash and combustible matter. The defendant generally kept his saddle in his drug store.  It was found in his privy soon after the fire.  A lot of defendant's carpenter's tools were also found in the privy at the same time. The privy referred to was situated some distance from the defendant's residence, and was in no danger of burning.  There was a crack under the west window of the west shed room, which appeared to have been made by the removal of a piece of weather boarding.  The said crack was between three and four inches wide, and was about fifteen inches long.  An elevated plank walk extended part of the way from the main building to the defendant's store.  There was a quantity of hay found under that walk.  Judging from appearances the witness thought that a small quantity of hay had been burned in the "L" corner of the dwelling.  Small quantities of hay appeared to have been dropped on the ground at intervals between the stable and the "L" corner of the dwelling, and along the path from the stable, on the south side of the residence, to a point between the store and the residence.  Defendant kept a supply of hay in his stable. The north door of the shed room did not fit the floor closely. Coal oil had been spilled along the floor from that door way to a point underneath the crack in the west shed room window.  Oil had also been spattered on the walls of the shed room.  The de-

fendant's dwelling house was an old building which was built in the country before the war; and was removed from the country to Tioga. If new, it would not be worth exceeding two hundred and twenty-five dollars. Had the defendant's dwelling burned, his store would almost certainly have been burned, and the burning of the store would have endangered the entire town. Sherman and Pilot Point were about forty miles by rail, or about twenty-five miles straight, apart. Tioga was distant about thirty-one miles by rail, and about twenty-five miles by wagon road, from Sherman. Witness, Nichols, Hatch, Ewing and Mershon were at Tioga for four or five days after the fire, but none of them were before the grand jury.

W. A. Ewing testified, for the State, that he attended the meeting of the business men of Tioga, at Kile's store, on the evening of the fire. He and Doctor Nichols were appointed by that meeting to guard the town during that night. Witness and Doctor Nichols left Kile's store at about ten o'clock. They first went north until they got beyond the defendant's premises. On passing, the witness heard footsteps in defendant's store. There was no light in the store at that time. From the north of defendant's store witness and Nichols turned northeast, and went about a quarter of a mile to a point near Porch's house. They remained in the neighborhood of Porch's house but a few minutes, seeing no one while there. On his way back, the witness saw the defendant in his front yard, north of and opposite the space between his store and dwelling. When he reached his own store the witness went in, leaving Nichols, and did not see him again until he met him at the fire. He did not know Nichols's whereabouts meanwhile. Witness remained a short while in his store, and while in there he got his pistol. From the back door of his store the witness saw the defendant in his back yard. When he discovered the defendant in his back yard, the witness left his back door and went to his wood pile, on the north side of his lot, about twenty-five feet from the front of his, witness's, store. Hatch's lot, about fifty feet wide, intervened between the witness and the defendant's lot. Witness remained at his wood pile between thirty and sixty minutes. The moon was then full, and occupied the space in the heavens that the sun does between ten and eleven o'clock a. m. While standing at his wood pile, the witness saw the defendant pass several times from his residence to his crib, but witness could not tell whether he carried anything back and forth or not. The defendant was dressed in

black, his coat being a long one. He had on a white standing collar and a high crowned hat. He made as many as three or four trips from the crib to the house, going sometimes towards the "L" corner of the house; other times he passed to the south of his house. During the time that the defendant was passing to and from the crib and the house, and once while he was in the crib, the witness heard a noise in the shed room of the house, which sounded like the coughing of a person and the dragging of a table. The cough sounded as though it proceeded from a lady. Witness twice heard this sound. The alarm of fire was given soon after the defendant made his last trip from the crib to the house. The alarm was given by witness, who fired his pistol. He thought that the defendant also discharged his pistol, but he could not then see the defendant. The witness was between sixty and seventy-five feet distant from the shed room when he heard the coughing and the moving of the table in that room. The hay found along the walk and near the burned parts of the house was of the kind that defendant had in his barn. It was bright baled hay. The ladder used to mount to the roof of defendant's house belonged to and was brought there by Mr. Hatch. Witness was at home for three or four days after the fire, but did not go before the grand jury.

Mat Raines was the next witness for the State. He testified that when he heard the alarm of fire, on the night that defendant's house was fired, he dressed and went to the defendant's premises, taking a bucket of water and an empty bucket with him. He entered the defendant's premises at the north gate, and detected some fire between the dwelling and the store. He emptied his bucket of water on that fire and put it out. At that time the defendant was standing at the southeast corner of his shed room. It was about that time that Hatch passed to the witness a ladder over the defendant's fence. The witness placed the ladder against the wall of the burning house and started to mount it, when defendant caught him and said: "Come down, Brother Mat; you will get hurt." Kile and Ewing then mounted to the roof of the dwelling, when defendant called to the crowd: "Let the house go, but for God's sake save my store." Had the dwelling become thoroughly inflamed, it would inevitably have burned the store. Witness saw hay under the steps and sill of the store, and under the plank walk which extended from the store to or near the house. When the witness first caught sight of the defendant at the fire, the latter was in the act of pulling

on his coat, and was dressed as he usually dressed in the day. The fire was extinguished in a very short time. The witness remained up after the fire until the officer arrived, but did not spend all of that time with the men who had charge of defendant. He went into the house when the officer entered and examined it. He saw that the walls of the shed room were wet on one side, but, as he had long been without the sense of smell, he could not say whether the walls were wet with water or coal oil. Defendant did not aid in putting out the fire, but walked about, exclaiming: "My God!" When the examining party entered the store, after the fire, the witness made an attempt to open the back door of the store, but found it securely locked. The defendant owned a collection of carpenter tools, which the witness, who was a blacksmith, sometimes borrowed. He sometimes found those tools in the hall of the dwelling, and sometimes in the store. As the witness went to the fire, he met Mrs. McGee at the defendant's gate. A short time before the fire, the witness saw a sign posted on a telegraph pole in front of defendant's store and another near the railroad crossing. They read: "Go to Baker's Saloon for Lemon Ginger." Lemon ginger was an intoxicating drink, and Tioga was in a precinct in which the local option law was in force.

Mrs. Joe Smith testified, for the State, that she and her husband were occupying the "office" on the northeast corner of the defendant's lot at the time of the fire. Witness's mother was with her at that time, the witness being sick, and within three weeks of confinement. Witness retired at about eight o'clock on that night, and slept until she was aroused by the fire alarm. She then got up and went to the south door of the office, and saw the fire in the "L" corner of the defendant's building. The blaze was then not more than two feet high. Defendant was standing within twelve feet of the fire, hallooing. He was then fully dressed in his ordinary every day clothes, and wore a high crowned hat. As soon as the alarm was given, witness's husband dressed and went to the fire. A few minutes later, Mrs. Baker, the defendant's wife, came into witness's house. When witness got up, after hearing the alarm, she saw her mother, Mrs. Kitchens, standing at the back door of the office.

G. W. Raines testified, for the State, that he made the fastening for the rear door of the defendant's store, which was a staple and hook. The defendant usually kept his saddle and tools in

his store. Lemon ginger and patent medicines were among the articles exposed for sale in the defendant's store. The witness saw a sign posted on a telegraph pole in front of defendant's store, which read: "Go to Baker's saloon for Lemon Ginger. (Signed.) W. C. T. U." He saw a like sign near the railway crossing, and another one in front of the Christian Church, of which defendant was a member. Witness did not think that defendant was a member of the W. C. T. U., a temperance organization. On two different occasions before the fire, the defendant said, in the hearing of the witness, that he was in fear of being burned out. Mr. Ben Robertson lived in Tioga at the time of the fire, and testified on the first trial of this defendant. He had since left Tioga, and witness had not seen him since. He said, when he left, that he was going to Arkansas. Witness was not a witness on the first trial of the defendant. The back door of the defendant's store fastened on the inside, and could not be opened from the outside. The door lapped into the facing, and the hook could not be reached from the outside.

Mrs. N. C. McGee was the next witness for the State. She testified that she lived in Tioga, just across the street and north of the "office" which stood on the northeast corner of defendant's lot. When the witness heard the fire alarm, she left her bed, and in her calico wrapper, which she was wearing as a night dress, she went to the fire, meeting the defendant at his north gate, dressed in his usual every day clothes. He was "carrying on" greatly about the impending destruction of his property, and witness told him that every thing in human power would be done to save things. Defendant then told the witness that she must not go into the house, as she might get hurt. The witness, however, went into the north room of the dwelling, and saw that the bed which stood in that room had not been slept in that night. Witness carried out a bed, and started back into the house, and into the other bed room, when the defendant's wife told her that she must not go into that room, as she might get hurt or killed. Witness did not see the defendant make any effort to save any of his property, but, after the fire was extinguished, she heard him say that he and all of his family had been chloroformed. Witness met Mr. Mat Raines at the north gate, and saw him go to a point between the store and the residence and extinguish a little fire. The defendant at that time was at the north gate. Witness saw two trunks in and across the hallway of defendant's residence. She attempted to move one

of them, but it was too heavy for her strength. The witness and Mrs. Baker, the defendant's wife, were members of the Christian church.

J. W. Hatch testified, for the State, that he went to the fire on defendant's premises as soon as he heard the alarm, taking his ladder with him, and handing it over the fence to Mat Raines. The witness saw the W. C. T. U. signs described by previous witnesses. He saw where the defendant's store house door and windows were disfigured with a knife a few days before the fire. Witness's home place lot adjoined the defendant's lot. Witness remained in Tioga for several days after the fire. He did not attend the business men's meeting at Kile's store on the evening of the fire. The sign over the defendant's store was "Dr. J. T. Baker's Drug Store." A few days before the fire the witness observed that the words "No; *Saloon*," had been written under the words "Drug Store." Witness did not testify upon the first trial.

Joe Smith testified, for the State, that at the time of the fire he occupied the "office" in the corner of the defendant's lot. He heard the alarm of fire and at once sprang out of bed and ran to his back door, where he found his wife and mother-in-law. The fire was then just catching the shingles on the roof of the residence. Witness dressed at once and went to the defendant's house. When the witness first went to his back door he saw defendant jumping about his back yard. When he got to defendant's north gate heard defendant say: "Everything I have got will soon be in ashes. They have set it on fire; now let them burn it. Don't try to put it out. Let it burn!" Soon after the fire was put out the defendant complained of being sick, and witness thought that Mershon arranged a bed for him to lie on. The witness was now testifying for the fourth time in this case, but had never before said anything about Mershon arranging a bed for the defendant. Witness carried a bed from one of the defendant's bed rooms during the fire. The coverlet had been turned down, but witness did not know whether or not the bed had been occupied during the night. When witness first saw defendant at the time of the fire the latter was dressed in his usual every day clothes. Witness passed defendant's store a few minutes either before or after ten o'clock on that night, and heard somebody walking in that store.

J. W. Stinnett testified, for the State, that he was one of several gentlemen to whom the defendant, a few days before the fire, showed his door, which had been disfigured by being cut

with a knife. The witness remarked that he had not thought the community harbored a man capable of performing so mean an act. Defendant replied that he would not be surprised to be burned out at any time.

County Attorney Randall testified, for the State, that the indictment against defendant was returned on April 4, 1885, three days after the fire. It was found upon the record of the examining court, inasmuch as the grand jury had completed its labors when the case was called to their attention, and were ready, and had imperative reasons, to adjourn.

The State closed.

John Phillips was the first witness for the defense. He testified that defendant had lived in Tioga about a year at the time of the fire. He had previously lived in Pilot Point. The witness hauled the defendant's household goods and general property from Pilot Point, when he moved to Tioga. At that time the defendant had about three full two horse wagon loads of household goods, furniture, clothing, etc. Witness was familiar with the defendant's Tioga property, and knew that, at the time of the fire, his store was ceiled overhead, on both sides and on the west end, but not on the east end. Witness heard the fire alarm, and went to the fire at once. Other parties reached it before he did, and were engaged in putting out the fire, which they finally succeeded in doing. Witness knew that the door and window of defendant's store were very much disfigured by cutting, as often as twice, a short time before the fire. He saw the signs described by several of the State's witnesses, which were signed "W. C. T. U.," which initials stood for "Women's Christian Temperance Union." Ben and Henry Robertson lived a short distance northeast of defendant's property at the time of the fire. The said Ben and Henry Robertson were men of family. They moved away from Tioga some time after the fire, and, when they left, they told the witness that they were going to Arkansas. Witness had not seen either of the said Robertsons since their departure from Tioga, but it was the general understanding among their friends and relatives that they were now residents of Idaho Territory. The railroad section house at Tioga was west of Doctor Nichols's house. The lumber pile referred to in the testimony of Doctor Nichols, was about one hundred yards north of the section house. Witness had attended every trial of this case, and had testified three times. Witness knew nothing about the meeting of the business men on the

evening of the fire.   Witness was not related to the defendant, but his wife's cousin, Henry Robertson, was the husband of defendant's wife's half sister.

John Hayes testified, for the defense, that on one Sunday, a few days after the fire on defendant's place, he and Ben Robertson and Dave Hayes went behind the lumber pile mentioned by Doctor Nichols in his testimony, to take a drink of whisky from a bottle which the witness had. .Behind that lumber pile the witness found a squirt gun which was about as large around as a man's thumb, and about twelve inches long.   The squirt gun was made of cane, a piece of cloth being wrapped around the end of the staff or piston.   The squirt gun had contained coal oil.   The gun, the piston, and the cloth around the piston smelled of coal oil.   Ben Robertson had the squirt gun when witness last saw it.   The witness was not related to defendant. He had testified but once before in this case.   Ben Robertson was in attendance upon this court at the first trial, but the witness could not say why he never testified about the squirt gun. Dave Hayes was not in attendance upon this trial, but attended all of the previous trials, and was never placed upon the witness stand.

Jim Kitchens testified, for the defense, that he went to the fire at defendant's place with Dave Hayes and others.   He saw Ben Robertson open the back door of the defendant's store from the outside.   He did it by inserting a knife blade between the door and the door facing, and raising the hook.   Witness was not related to defendant, and had never before testified in this case.

S. H. Bradley testified, for the defense, that he was now occupying the defendant's property in Tioga, and had occupied it since a short time after the fire.   He had frequently opened the back door of the store with the small blade of his pocket knife, and had seen his children open it with sticks.   Witness was not related to defendant.   The witness knew of no change having been made in that door since the fire, nor was there anything about it to show that a change had ever been made.

Doctor J. S. Nichols, recalled by the defense, testified that he had no recollection of going to Ewing's for a ladder on the evening of the fire.   He did not remember that he ever, at any time or place, told A. J. Mershon that he went to Ewing's to get a ladder on that evening.

A. J. Mershon testified, for the defense, that having heard, but not believing, that Doctor Nichols went to Ewing's store on

the evening of the fire to borrow a ladder, he, on meeting Doctor Nichols in Sherman, just after the defendant's first trial, asked him if what he had heard was true. Doctor Nichols replied positively that he did go to the store of Ewing Brothers on that evening for a ladder. Witness could not possibly be mistaken in this statement.

W. W. Lambkin testified, for the defense, that he lived at Denison. In April, 1885, and prior thereto, the witness was a fireman on the Missouri Pacific Railway. Witness was not acquainted with the defendant prior to his arrest for the offense charged in this indictment, but had met him several times since. He, however, was familiar with the defendant's property in Tioga. The witness was firing an engine on the north bound freight train which passed through Tioga on the night that defendant's house was fired. When the witness's engine reached a point nearly southwest, and almost opposite the defendant's residence, witness saw a man at a point a little south, and about forty feet west from the defendant's property, running rapidly in a northwest direction. He crossed the railroad track just in front of the engine, and hid behind a pair of scales on the west side of the track. Immediately after the witness saw that man he heard the fire alarm and saw the flames rising over the defendant's dwelling. The witness, when he first saw the man running, thought he was a "bum" trying to steal a ride, and said to the engineer, Adams, after the man got across the track: "We came very near running over that bum." Since that night the witness had made an examination of the defendant's premises, and was now able to say that the man whom he saw running, ran from the direction of a little gate on the west end of defendant's lot, just south of his drug store. The man whom witness saw running was neither the defendant nor Doctor Nichols. Witness had attended every trial of this case, and testified on every trial but one. W. Mahan, the brakeman on the freight train of which witness was fireman in April, 1885, attended and testified at one or two trials of this case, but was not in attendance upon this trial. He was working on the lower end of the railroad a few months prior to this trial, but witness did not know that he was now working for the railroad company. He did not know that there was any general understanding about Mahan's present whereabouts.

Nat Gunter testified, for the defense, that he was the counsel for the defense. He obtained permission from the court to talk

to the witness Jack Adams. About the time that he finished his talk with Adams about this case, the witness Lambkin stepped up and asked witness when he and Adams could get off. Witness did not talk to Adams in Lambkin's presence. Soon after Lambkin joined witness and Adams, the county attorney came up, and talked to Adams.

Deputy Sheriff Middleton testified, for the defense, that soon after the county attorney finished his conversation with Jack Adams, which was just after Adams had been placed under the rule, the witness suppœnaed him, Adams, for the defendant, took him into court, had him recognized for the defendant, and again placed him under the rule.

District Clerk E. O. Thomas testified, for the defense, that Jack Adams was recognized as a witness in this case but once, and then for the defendant. He was brought to court under attachment for the State.

Mrs. J. T. Baker, the wife of defendant, testifing for the defense, identified certain letters as those received by defendant at intervals prior to the fire. One of the letters came through the mail, and the others were found by defendant under his store door. Witness did not see defendant find them. Defendant told her that he found them under the door. The defense then introduced the letters; the first of which reads as follows:

"Baker, you dot seem to pay any attention to the signs that was up for you. We will attend to your case again as soon as the sign gets right. What are you here for any how? You cant never do any good at this place. *We will see to it.*

W. C. T. U."

Endorsed. "Dock Baker's Saloon."

The second letter reads as follows:

"Baker, you dont seem to pay any attention to the signs that was put up for you. Did you know you was not wanted in this place? We dont need a saloon here. We will attend to your case when the sign gets right, you cant stay here, as we will show you out. We have got the bet on our side. What did you come here for?

W. C. T. U."

Endorsed: "Dr. Rev. Baker's M. D. Saloon." Picture and printed below it: "Your old Friend,"—and the following lines:

"Follow your nose, you'll find him in
Your ancient friend, old Holland Gin,
And I've been told that often before
You've met him slyly behind the door."

The endorsements below this last verse are lead pencil caricatures bearing the legends: "Lemon Ginger!" "Lemon!" "Lemon Ginger!" "Labeling Labratory Lemon!" "Sour Mash Whiskey!" "Lem. Gin. Filling Bottles!"

The third document reads as follows:

"Baker: We think it would be best for you to quit taking the bread and wine. Don't you? This is the opinion of the leading members of the church, and, in fact, it is their request, as they think you will commit sin in doing so. Don't you think it would be best for you to leave here, for we don't think you can do any good here, for we think the community will all work against you. You remember the signs that were put up for you some time ago. That was a hint for you, and we hope you will take it. You seem to be inclined to make fun instead of taking the hint. Ma be you will get another soon that will not be so funny.

"What do you mean by painting and fixing up so? Where do you get the money? We was in hopes you had about come to the end, but it seems you have made a raise some way. Now, we hope you will take the above advice, as you are not need her.

(Signed)                                          W. C. T. U."

Envelopes are addressed:

"To the Great ——— of America, or to Parson Baker, Saloon, Tioga, Texas."

"J. T. Baker, M. D., Tioga, Texas."

"Dr. Baker, Tioga, Texas."

"To Parson Baker, Jackleg Doctor, or His Saloon."

"Parson Baker, Tioga (In Care of His Wife), Tioga, Texas."

"There down your throat he swiftly goes,
And rises again to paint your nose;
Of all the beats with which earth is cursed,
A tippling woman is far the worst!"

Endorsed: "I will send this back and you can sell it." Under this doggerel was the caricature of a man, across whose forehead

was printed, "Branes Wanted: Inquire Within." Under this picture was written the following rhymes:

*"Brains Wanted."*
"I send you here a little sketch,
'Tis just the thing for you;
Your head is surely void of brains,
And much they're wanted, too.
I don't see how you get along
With such an empty nut,
Or why, before you lost your brains,
Your mouth you did not shut."

Below this appeared another picture of two figures. Above the picture appears the words:

"A Large Supply of Fresh Gas Always on Hand.
Teeth Extracted Without Pain."

The word "Gas" is printed on the upper lip of one of the figures, and beneath the picture appears the following:

*"Dentist."*
"You call yourself a *Dentist*,
While you work with blacksmiths' tongs,
And use a pair of pincers rough
To pull away the *prongs*.
And though about your wond'rous *Gas*
You make a great to do,
The strongest gas about the place
Is that which comes from *you!"*

J. D. Woods was the next witness for the defense. He testified that he was one of the counsel for the defendant. He attended all of the trials of the defendant except his examining trial, and heard all of the testimony adduced on the several trials in the district court. On the first trial of the defendant, Ben Robertson testified, in substance, that at the time of the fire he lived about one hundred and fifty yards northeast from the defendant's place, and between that place and the Porch place; that he was at home during the first part of the night of the fire; that, upon being aroused from sleep by the fire alarm, he got up

from bed and started to the fire; that, as he was starting, he heard, but could not see, somebody running rapidly away from the direction of the defendant's premises; that he went to the fire and helped put it out; that since the fire he had opened, and had seen others open, the back door of the defendant's store, from the outside, with a knife blade or stick." The witness had seen a squirt gun which was said to have been found in Tioga. He had that gun on the first trial of this case, but did not put it in evidence. There was no proof about the squirt gun in that trial, and as he was not in the habit of disclosing his case to his adversary in the practice of his profession, he did not tell the county attorney anything about the squirt gun. The State did not rely upon circumstantial evidence on the first trial, but introduced Mrs. Kitchens as a witness, and she claimed, in her testimony, to have seen the house fired.

Mrs. J. T. Baker, defendant's wife, being recalled, testified, in his behalf, that she reached home from Pilot Point late on the evening of April 1, 1885, and, being much fatigued by her trip and the care of a sick child, ate a cold supper and went to bed early. Witness and her little boy slept in the north room of the house, and the defendant slept in the room just south of that occupied by the witness and her little son. Just after the witness retired the defendant went into the south room and undressed. He then came into witness's room, got the lamp and went out of the room. Witness did not hear him enter the south room, but supposed that he went into it. Witness and the defendant had not occupied the same bed for some time prior to the night of the fire because of the illness of their child, which required the witness's constant presence and attention. Witness went to sleep immediately upon retiring on the night of April 1, 1885, and slept soundly, hearing and knowing nothing until the defendant awakened her with the alarm of fire. As witness got out of bed she saw defendant going through the door of her room into the hall, pulling on his coat as he went. Witness seized her child and hastily went to Joe Smith's family, who lived in the "office." She met Joe Smith coming out at the north door of the office as she went in. Leaving her child in Smith's house, the witness went back to the fire, where she saw Mrs. McGee. Witness and Mrs. McGee went together into the north room of the dwelling, recently abandoned by witness. Mrs. McGee took some of the things out of that room. The bed in that room in which the

witness and her child had slept until driven out by the fire had not been made up since witness left it.

After the fire was put out, the witness went to her mother's house in company with her brothers, and knew nothing about the arrest of her husband until she sent for him to come to breakfast on the next morning. Witness was then taken sick and did not see the defendant for several weeks. About a week after the fire the witness sent Henry Robertson to Constable Bonnie to get the keys to the premises. Robertson brought her the keys and the defendant's knife, but brought no greasy cloth or towel, of which the witness up to that time knew and had heard nothing. A walnut book case with glass shutters stood on a table in the west shed room, a little south of the window. The lamp and matches were usually kept on that table at night. No curtain had ever been nailed to or about that book case up to the time that the fire broke out. There was no box with a curtain or cloth nailed to or over it, containing books, in that room. When the witness went back to the house, several days after the fire, she discovered what she took to be coal oil spattered from the north door of the kitchen, through the partition door, to near the crack under the west window of the sitting room. A curtain hung over the said west window, and reached nearly to the said crack. That curtain was burned. The defendant's store and dwelling house were freshly painted about a month before the fire. At that time the store was "straightened up," and the tools and saddle were placed in the privy, where they were kept until the fire. The three trunks of witness and the defendant had always been kept in the hall, sitting sgainst the west wall. They were not standing across the hall when the witness, leaving the house at the time of the fire, went through the hall. Some clothing hung along the wall of the main building. Witness found, after the fire, that the said clothing had been taken from the walls and piled in the floor. While the premises were being painted the witness saw her husband and Ben Robertson pour some coal oil on some paint that was on the store floor. Witness knew that the coal oil can, which had been in use for some time, and which usually sat on the floor in the northeast corner of the kitchen, leaked, and that some oil had leaked from it to the floor before the fire. The witness denied that she prevented Mrs. McGee from going into the shed room on the night of the fire, nor did she object to Mrs. McGee going into said room, either by word, sign, look or act.

One night, a short time before the fire, one Hiser came to witness's house, with Doctor Nichols, to get defendant to pull a tooth for Doctor Nichols.

Mrs. J. S. Nichols testified, for the defense, that she was not at home during the early part of the night of the fire, and did not see her husband when he came to the house and got his overcoat. A few nights before the fire Doctor Nichols went to defendant's house to get defendant to extract a tooth for him. Defendant either pulled the tooth out or broke it off.

D. J. Hiser testified, for the State, that, at the time of the fire, he was reading medicine under Doctor Nichols, and carried the mail between the trains and the postoffice, which was in charge of Doctor Nichols. The witness never went with Doctor Nichols to the house of the defendant for Doctor Nichols to get a tooth pulled. Doctor Nichols had a tooth pulled, but not by defendant in the presence of the witness. Doctor Nichols's reputation for truth and veracity was good. On his way to the train with the mail, at about three o'clock on the morning of April 2, 1885, the witness learned of the fire. From that hour until morning he helped to guard the defendant, and went with him as a guard to Collinsville, and remained with him until the examining trial.

The defense closed.

A. M. McElroy, James Kitchens, S. H. Bradley, James Stinnett, G. W. Raines and Solon Tatter, witnesses for the State, testified that they severally knew the reputation of Doctor Nichols for truth and veracity, and that it was good.

The motion for new trial raised the questions discussed in the opinion.

*Woods & Smith, Brown, Gunter & Gilbert,* and *Pasco & Russell,* filed an able brief and argument for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. There are two counts in the indictment; the first charging that the defendant burned his own house, the said house being at the time insured; the second charged that he burned his own house, thereby endangering the safety of houses belonging to other persons. We are of the opinion that the indictment is substantially sufficient in both its counts, and that the defendant's exceptions thereto and his motion in arrest of

judgment were properly overruled.   The *locus in quo* of the house burned is alleged sufficiently, the allegation being "a certain house then and there occupied, owned and controlled by him, the said Baker," the words "then and there" referring to the time and county previously stated.   It was unnecessary to allege the amount of the insurance upon the house, the company in which it was insured, or other facts in relation to the insurance. It was only necessary to allege that, at the time the house was burned, it was insured.   That portion of the first count in the indictment which states that "the amount of said insurance and a further description of which is to the grand jurors unknown" is surplusage, and should have been treated as immaterial, and wholly disregarded on the trial.

With respect to the second count, we do not think it was essential to allege who owned the houses which were endangered by the burning of defendant's house.   Such an allegation is usual and proper, but not absolutely essential, as it is immaterial who owned the houses so endangered, if they were owned by other persons than the defendant.

We learn, from a statement made in the charge of the court, that the county attorney elected to try the defendant upon the first count in the indictment.   This is all the information afforded by the record as to the election.   There is no notice of it taken in the judgment entry, or in any other entry in the case.   We must presume, therefore, from the statement made in the charge of the court, that the State voluntarily abandoned and dismissed the second count.   It does not appear that such election was required by the court, nor do we think it could properly have been required.   It is only when distinct felonies, not of the same character, are charged in different counts in the same indictment that the State may be required to elect upon which count it will claim a conviction.   (Lunn v. The State, 44 Texas, 85; Boles v. The State, 3 Texas. Ct. App., 650; Chester v. The State, 23 Texas Ct. App., 577.)   In this case the same felony is charged in each count.

But, the State having elected to try the defendant upon the first count, and the court having sanctioned such election, that count alone should have been submitted to the jury, and the jury should have been explicitly instructed that they could not consider and could not convict upon the second count.   In defining arson the learned judge, in his charge to the jury, embraced both counts in the indictment; that is, burning an insured house, and

burning a house the burning of which endangered other houses not belonging to defendant. That portion of the charge which embraced the arson charged in the second count is erroneous because it is not the law applicable to the case, and because it submitted to the jury an issue not in the case. This error in the charge, not having been excepted to, would not be reversible error unless it was calculated to injure the rights of the defendant, and whether the error is of that character we do not determine, as it is unnecessary that we should do, there being another error for which the judgment must be set aside.

We are of the opinion that the court erred in admitting the testimony of the witness Pelfry, detailing a conversation which the defendant had with him at a time when the defendant was under arrest. This testimony was evidently introduced by the State as inculpatory; as a circumstance tending to prove defendant's guilt; as a *quasi* confession of guilt. If not introduced for this purpose, it was wholly irrelevant and should for that reason have been rejected.

If introduced as inculpatory evidence, it was inadmissible because the statements were made by the defendant while he was under arrest, and without being first cautioned that any statement he made might be used in evidence against him. The fact that, a few hours prior to the time of making said statements, he had been cautioned by the magistrate before whom the charge against him was being investigated, that a voluntary statement, if he should make one, might be used in evidence against him, does not, we think, dispense with a caution with respect to statements subsequently made, on another occasion, to another party and under entirely different circumstances. The caution given him by the magistrate related alone to a voluntary statement,—a judicial proceeding in the presence of the court,—a written statement to be signed by the defendant It would be stretching the rule too much, we think, to apply a caution made under such circumstances to any and all statements made by the defendant on subsequent occasions.

We do not agree to the rule as state m arnes v. The State, 36 Texas, 356, that the caution must immediately precede the confession. That rule, we think, is too extreme, and in the subsequent case of Maddox v. the State, 41 Texas, 205, it was not strictly adhered to. We think the true rule is that, if the defendant was properly cautioned that statements made by him might be used in evidence against him, and he thereafter, within

a reasonable time, made statements reasonably coming within the scope of the caution given him, such statements would be admissible against him.

But we do not think the statements made by the defendant in this instance come within this rule. They are not statements reasonably embraced within the caution given the defendant by the magistrate, for that caution was limited to a voluntary statement, and was not intended to, and could not, we think, apply to any other statement. This is a new question as far as we are aware, and we have been unable to find any authority which has aided us in reaching a conclusion upon it. The conclusion we have arrived at is based alone upon what we conceive to be the spirit of the law regulating the admissibility in evidence of confessions. Confessions of persons in confinement or in the custody of an officer are only admissible under the conditions prescribed in the statute, and the caution required in the case of a voluntary statement is a distinct caution from that required in the case of other confessions, and is applicable alone to the statements made before the magistrate, reduced to writing and signed by the defendant. (Code Crim. Proc., art. 750.)

Other errors assigned and presented in the brief and argument of counsel for defendant have received our attention, but we are of the opinion that the only material errors are those which we have discussed, and because of the last named of which the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 8, 1888.